UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAWN M. SHELLY                    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )        Case No. 4:11CV1122 CDP
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

## MEMORANDUM AND ORDER

This action seeking judicial review of the Commissioner's decision to deny

social security benefits is before the Court for the second time.  In the earlier case,

the Commissioner requested that the court remand the case for further

development of the record, and I granted that request.  See case No.

4:09CV1365CDP.  On remand, the Commissioner again denied benefits.  After

considering the record as a whole, I find that the ALJ's second decision is not

supported by the evidence.

Shelly applied for disability insurance benefits under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*  She also applied for supplemental security

income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  Final

decisions of the Commissioner under Title II and Title XVI  are subject to judicial

review under Section 205(g) of the Act, 42 U.S.C. § 405(g) and Section

1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3).

Shelly claims she is disabled because of degenerative disc disease in the

lower back.  She alleged an onset date of March 14, 2004 for her disability and

filed her applications for benefits on January 27, 2006.  Her applications were

denied on May 19, 2006, and Shelly filed a timely written request for a hearing.

Following a hearing, Administrative Law Judge (ALJ) Pappenfus found on July

22, 2008 that Shelly was not disabled.  The Appeals Council of the Social Security

Administration denied Shelly's  request for review on June 23, 2009, and Shelly

sought review in this Court.  On March 8, 2010 at the Commissioner's request, I

remanded this case to the Social Security Administration for further development

of the record and review pursuant to sentence four of 42 U.S.C. § 405(g).

On remand, the case returned to ALJ Pappenfus.  Following additional

hearings, the ALJ issued a second decision denying benefits on February 23, 2011.

The decision of the ALJ stands as the final decision of the Commissioner, and

Shelly again filed an action for judicial review before this Court.  I conclude that

the new decision is not supported by substantial evidence for the reasons that

follow.

## Evidence Before the Administrative Law Judge

### Medical Records

Shelly alleges an onset date of disability of March 14, 2004.  However, some discussion of medical records prior to this date will be included to provide needed  background information.

*Medical records prior to alleged onset date of March 14, 2004*

On June 3, 2003, Shelly sought emergency room treatment for lower back pain, saying that she felt shocks through her back after attempting to stand.  X-Rays revealed adequately aligned vertebrae and preserved disc spaces.

Following this emergency room visit, Shelly saw D.L. Davis, M.D. on June 9, 2003 for continued and worsening back pain.  She also complained that her medication caused her to vomit and that her dog recently dragged her around while on a walk.  Dr. Davis prescribed new pain medication and ordered an MRI. The MRI on June 13, 2003 found very minimal degenerative disc disease at L5-S1 and no significant disc bulge.  Shelly returned to Dr. Davis on June 19, 2003.  Dr. Davis noted she had "chronic low back pain" and referred her to pain management.

On June 26, 2003, Shelly visited Yuli Soeter, M.D., a pain management specialist.  Dr. Soeter prescribed physical therapy, medications, and a lumbar

- 3 -

epidural steroid shot.  Shelly returned to Dr. Davis on July 3, 2003, who again noted chronic low back pain and allowed Shelly to return to work on light duty.

Shelly visited an orthopedic spine specialist, Michael C. Chabot, D.O., on September 29, 2003.  He noted that Shelly had previously undergone physical therapy and an epidural steroid shot with no improvements.  Finding that the majority of her complaints were musculoskeletal in nature, he advised continued use of Vicodin and Flexeril and pain management.  Upon finding that Dr. Chabot's pain management referral was not in her insurance company's network, Shelly visited Abigail Neighmond, D.O., in order to obtain a different pain management referral.  Dr. Neighmond noted that Shelly reported pain so bad that she could not sleep and could hardly function.  She found Shelly had a "a slight antalgic gait" and also noted that further physical therapy would be unlikely to help due to the pain.

Dr. Neighmond referred Shelly to Brian Smith, M.D.  At the initial visit on October 23, 2003, the pain management specialist noted that previous physical therapy had provided partial relief, and that she continued to have sharp, shooting pains.  He noted that lumbar flexion and extension exacerbated the pain.  Dr. Smith diagnosed lumbar facet arthropathy, bilateral sacroiliitis, and degenerative disc disease with possible discogenic pain.  Bilateral lumbar facet injections were

administered.  Upon Shelly's next visit on November 11, 2003, she reported four days of pain relief from the shots before the pain returned.  Dr. Smith administered bilateral injections to the sacroiliac joint and continued her Vicodin prescription. When Shelly returned on December 1, 2003, she reported no relief from the sacroiliac injections.  Dr. Smith diagnosed bilateral facet arthropathy and degenerative disc disease and administered bilateral radio frequency denervation for nerve branches.

Shelly again sought emergency room treatment on January 11, 2004 for sharp neck pain.  X-Rays of the thoracic spine were negative.  She next sought emergency room treatment on February 17, 2004 after falling down stairs.  X-Rays showed no fractures.

*Medical records after alleged onset date of March 14, 2004*

On April 14, 2004, Shelly visited Dr. Neighmond.  She stated that she had been raped on March 17, 2004, and she had been seeing a counselor.  She reported an inability to sleep, a fear of being alone, and depression.  Dr. Neighmond diagnosed her with posttraumatic stress disorder,  prescribed Zoloft and Ambien. Dr. Neighmond, and agreed to complete work-related disability forms.

Shelly returned to Dr. Smith on April 21, 2004 for her back pain.  She reported temporary, seventy-five percent relief from the prior radio frequency

denervation, but the sharp pain returned.  Dr. Smith again administered the

bilateral radio frequency denervation and continued medication.

On May 17, 2004, Shelly reported an improvement in her posttraumatic

stress disorder to Dr. Neighmond.  However, she reported continued difficulties

with traveling alone in public, and she continued to see a counselor.  Dr.

Neighmond continued Shelly's Zoloft prescription and advised continued

counseling.

Shelly underwent an MRI on July 1, 2004 which showed more prominent

degenerative disc disease at L5-S1, intervertebral disc space narrowing, and a

small focal disc extrusion.  Upon visiting Dr. Smith on July 15, 2004, Shelly stated

that the previous radio frequency denervation had provided only ten percent relief,

though medications provided fifty percent relief.  An examination found limited

range of motion in the lumbar spine with pain.  Notes indicated a normal gait.  Dr.

Smith diagnosed bilateral lumbar radiculopathy, dentral disc herniation at L5-S1,

and lumbar spondylosis with possible residual facet arthropathy.  He administered

bilateral L5 selective epidural steroid injections and prescribed new medications.

During an August 4, 2004 visit, Shelly reported no relief from the injections.

Injections were again administered and new medication prescribed.  The continued

prescription for Zoloft was noted.  On August 25, 2004, Shelly again reported no

relief from the injections but 60% relief from medications.  Dr. Smith diagnosed possible discogenic pain and discussed possible treatment options.  Shelly chose to undergo an initially conservative approach.  More injections were administered.

Shelly returned to Dr. Smith on September 22, 2004 after receiving no relief from injections.  The examination noted limited range of motion with pain and a normal gait.  To assess possible discogenic pain, Shelly underwent a discogram, which was positive.  It revealed very mild pain at L4-5 at very high pressures of 90-100 psi, but it also revealed severe concordant pain at L5-S1 at pressures of only 20-25 psi.  Further, the discogram found evidence of extradiscal extravasation into the epidural space.  A subsequent computer tomography (CT) found some bulging and degeneration at L4-5.  Additionally, L5-S1 was described as more degenerated with a very disorganized nucleus and a more diffuse disc bulge.

On October 7, 2004, in light of the CT scan and positive discogram, Dr. Smith found an intradiscal electrothermal annuloplasty (IDET) procedure to be medically necessary.  He also discussed a possible lumbar spinal fusion.  Shelly agreed to proceed with the IDET "if at all possible."  However, a December 16, 2004 visit to Dr. Smith noted that Shelly's insurance company would not approve the IDET procedure.  Spinal fusion was again discussed, although Dr. Smith

wished to again try injections prior to surgery.  He administered an epidural steroid injection.

Shelly visited a new pain specialist, Barry I. Feinberg, M.D., on May 31, 2005.  In the medical evaluation, Shelly reported constant pain, usually at a level of eight out of ten with pain sometimes at ten out of ten.  She stated she had not been seeing Dr. Smith regularly since her last visit because her insurance expired. She stated that sitting or standing for 20-30 minutes worsened her pain.  Dr. Feinberg noted a "markedly antalgic" gait, a positive right straight leg raise, bilateral tenderness over the sacroiliac joints, and a positive Spurling's maneuver. He diagnosed lumbar radiculopathy, degenerative disc disease, lumbar spondylosis, sacroiliac joint dysfunction, and musculoskeletal pain of the low back.  He recommended further diagnostic testing and neurosurgical consultation. Dr. Feinberg noted that aggressive pain management procedures had not alleviated Shelly's pain, so all surgical options should be considered.  Further, this work should be done timely to "avert the possibility of a permanent neurologic defect."

After losing her insurance, Shelly did not see Dr. Smith in 2005, but she called him regularly to obtain pain medication refills.  Shelly's next emergency room visit occurred on November 28, 2005 due to low back and leg pain after a fall.  She noted that any movement exacerbated the pain, and it was relieved only

by remaining still.

On January 26, 2006, Shelly visited Dr. Neighmond regarding her back pain.  She told Dr. Neighmond that she could hardly do any normal activities and had problems walking upright.  Dr. Neighmond noted an abnormal, slow, forward-tilted gait.  Dr. Neighmond further noted lumbar muscle spasms.  She prescribed new medication for the muscle spasms.

Shelly continued to regularly call Dr. Smith for pain medication refills in 2006.  She visited him on August 3, 2006 due to new radicular symptoms.  She arrived in a wheelchair.  The examination revealed four out of five lower, bilateral muscle testing, but Dr. Smith found this to be effort dependent.  Moreover, he found the exam to cause a "significant increase in her back pain."  In the assessment, he found the pain radiating down the right side of her leg was possibly caused by an L5 nerve distribution.  Shelly reported episodes of her legs giving out, which Dr. Smith attributed either to the radicular pain or to actual motor loss from nerve root compression.  He stated that no medical providers were "willing to do further evaluations with MRI or consider possible surgery because she cannot afford it" and "she does not have any health insurance."  Given her symptoms, Dr. Smith did not want to provide any injections.  He prescribed medications.

On February 12, 2007, Shelly again visited Dr. Smith.  She reported thirty

percent relief from medication.  The exam noted limited range of motion with lumbar flexion and extension, a normal gait, and five out of five muscle strength. Dr. Smith noted that he was trying to limit the frequency of visits because of Shelly's lack of health insurance.  He also prescribed a change in medication to reduce potential hepatic toxicity.  Ten days later, Shelly called to inquire about a cheaper medication.  Shelly returned to Dr. Smith on March 1, 2007 with unchanged symptoms.

Shelly's next visit to Dr. Smith occurred on June 14, 2007.  She again complained of severe radicular pain and leg failure.  She reported sixty percent relief with a combination of Hydrocodone and Ibuprofen.  The exam noted decreased lower muscle strength and limited range of motion with pain-inducing lumbar flexion and extension. A physician's assistant prescribed pain medication and discussed cheaper alternatives.

On September 20, 2007, Shelly visited Dr. Smith due to a "marked increase in her pain" caused by pain "radiating down her right leg."  The exam noted a guarded gait and a positive straight leg raise.  Dr. Smith diagnosed a probable L5-S1 disc herniation with right radiculopathy.  He performed a steroid injection and prescribed stronger medication.  He also noted that a microdiskectomy may be beneficial, but he doubted "she will be able to find a surgeon who will operate for

free."

Shelly again returned to see Dr. Smith on October 4, 2007.  She reported a partial, temporary improvement in symptoms from the steroid injection and fifty percent relief in symptoms from medication.  She stated that her leg pain had improved more than her back pain.  Dr. Smith explained that the back pain would be more difficult to resolve with injections.  Shelly had limited range of motion in the lumbar spine, and both flexion and extension caused pain.  Dr. Smith again administered a bilateral steroid injection after diagnosing a probable disc herniation with radiculopathy and axial low back pain caused by degenerative disc disease.  Shelly next telephoned Dr. Smith's office on November 9, 2007 to report that the injections were not working and to request stronger medication.

On January 28, 2008, Shelly visited Dr. Smith's office due to unchanged symptoms.  She did note sixty-five percent relief from symptoms when on medication, but reported some side effects.  The relief occurred more with her leg pain than back pain, which remained at the usual baseline level.  Dr. Smith refilled Shelly's Hydrocodone.

Shelly called Dr. Smith's office on April 11, 2008 stating she could hardly walk and considered going to the emergency room.  Three days later, she visited Dr. Smith's office saying her pain worsened following a fall.  Both the back pain

and radicular leg pain intensified, and some numbness was noted.  Dr. Smith noted

a right-sided limp, full lower extremity strength, and moderate depression.  He

administered a steroid injection and refilled Shelly's medication.

On June 10, 2008, Shelly visited Dr. Feinberg.  She reported very low daily

activities, saying she could only walk one block and stand for half an hour at a

time.  She reported doing some light housework.  His examination revealed some

distress, a marked limp, a positive straight leg raise at thirty degrees, a positive

Gaines maneuver, a positive sacroiliac compression, and a positive Spurling with

spinal hyperextension.  The exam further revealed no neurological deficit but

marked weakness.  Her right side revealed "poor effort" and increased pain with

effort.  Moreover, Dr. Feinberg could not ascertain whether true neuromuscular

weakness or increased pain caused the marked weakness.  Tenderness at multiple

trigger points also reproduced pain.  No atrophy or hypertrophy was noted.

At the direction of Dr. Feinberg, Shelly underwent an MRI on June 20, 2008

which revealed facet osteoarthritic changes, diffuse degenerative disc disease, and

central disc bulging.  Dr. Feinberg recommended a surgical consultation.  He

stated Shelly was certainly "not capable of obtaining or maintaining gainful

employment" at the date of the exam, and was not capable "of obtaining or

maintaining gainful employment last time she was seen in May 2005."

Shelly visited an orthopaedic surgeon, David S. Raskas, M.D., on November 7, 2008.  Shelly described average pain of sixty and seventy out of 100, worsened by exercise, sitting, standing, and bending.  An exam found a short-strided gait with a "forward flexed guarded posture," some muscle tone loss in her back and lower extremities, decreased sensation in the lower extremities, significantly limited range of motion, and motor strength "giving way in her lower extremities in all motor groups."  An X-Ray revealed disc narrowing and a severely collapsed disc.  Dr. Raskas stated that, based on her imaging tests and complaints, it would be reasonable to consider either fusion or disc arthroplasty.  He stated that Shelly wished to proceed with the disc replacement.  He further stated that Shelly was "completely and totally disabled right now and has been so for several years."  Also, he opined that she was "in need of the above surgery" and "has been disabled for the last four and a half years..."

On January 15, 2009, Shelly returned to Dr. Smith's office due to unchanged bilateral low back and leg pain.  Normal gait and lower extremity muscle strength were noted.  Dr. Smith refilled her medication and stated she was pursuing financial arrangements to undergo the disc replacement.  Shelly next visited Dr. Smith's office on September 16, 2009 with significant low back pain. A normal gait, normal lower extremity strength, and decreased lumbar spine range

of motion with pain were noted.  Medications were refilled.  She again returned to Dr. Smith's office on November 30, 2009.  Dr. Smith refilled her medication and instructed her to return in six months.

Shelly again visited Dr. Smith on May 10, 2010.  She reported good pain relief of up to sixty-five percent from Methadone, though the leg and back pain persisted.  A normal gait and normal muscle strength were noted.  Good lumbar spine range of motion was also noted, though with pain.  A nurse practitioner prescribed increased Methadone to further reduce the need for other medication.  An August 9, 2010 visit to Dr. Smith again revealed a normal gait and lower extremity muscle strength.  Pain improvement of sixty percent was noted.  Dr. Smith refilled her Methadone and stated she would continue to taper her Hydrocodone.  In an October 11, 2010 visit, Shelly reported sixty-five percent pain improvement derived from medication.  Dr. Smith again refilled her Methadone.

On November 1, 2010, Shelly returned to Dr. Smith's office while experiencing a bad day of back pain.  The examination noted "severely limited flexion and extension of the lumbar spine" and increased pain with both.  Also, Shelly had a guarded gait with a right sided limp and forward posture.  Four out of five lower extremity muscle strength and a positive straight leg raise were noted.

- 14 -

During the exam, she "appeared to give away" due to the pain.  Dr. Smith refilled Shelly's medication.

*Letters from physicians*

On January 12, 2005, a letter from Dr. Smith noted that Shelly had been unable to return to work because of severe pain.  He stated that the IDET procedure was medically necessary to treat her discogenic pain, and that she would be unable to return to work without it.

In a January 30, 2006 letter, Dr. Neighmond stated that she had been seeing Shelly prior to 2003, and Shelly had not experienced any back pain prior to June 2003.  She further stated that Shelly was considering surgery since conservative treatment provided little relief.

Dr. Smith also dictated a letter dated January 30, 2006.  He noted the positive discogram and stated that the IDET procedure would be used to treat her chronic low back pain. Disc replacement or spinal fusion represented the alternative to IDET.  Due to the severity of the pain, Dr. Smith stated that Shelly had been unable to return to work.

In another letter dated March 1, 2007, Dr. Smith again noted the positive discogram and the failed conservative treatment.  He noted that the objective evidence from the discogram supported her pain descriptions.  Due to this severe

pain, her physical activity was severely limited.  He found it medically necessary to either perform an IDET or spinal surgery.

Dr. Smith next wrote a letter on January 24, 2008.  He again noted the positive discogram and stated she had now developed lumbar radicular symptoms. He also noted the need for further procedures such as an IDET or surgery.  He stated that she could not afford these procedures without insurance, and that she would not be able to work in the future without some definitive treatment.

On November 21, 2008, Dr. Feinberg clarified Shelly's pain.  He stated that Shelly's muscular effort is limited by pain and that "clinical findings in this office support the patient's pain complaints and are explicitly verified by diagnostic studies."  Furthermore, a lack of atrophy is medically irrelevant to the discogenic pain process, as Dr. Raskas also described.  Lastly, he stated that Shelly will remain disabled until she gets surgery, and there is a "risk of permanent neurologic defect due to the delay in surgical intervention."

Dr. Smith again wrote a letter dated June 28, 2010.  He again noted the degenerative disc disease and the positive discogram.  He also noted the development of radicular symptoms.  He stated that, without insurance, Shelly cannot afford needed procedures such as surgery.  Without some definitive treatment, he opined she would be unable to work.

- 16 -

On November 1, 2010, Dr. Smith wrote a letter in response to an ALJ's letter to his office.  He clarified his medical records, saying that the subjective section is a combination of answers from a patient questionnaire and narrative information from the health care provider.  In the objective section, a nurse or nurse tech tests the vital signs.  Further, either he or a nurse practitioner perform the documented tests and then dictate the results into the record.  The October 11, 2010 visit corresponded to this procedure.  He stated that Shelly was treated like any other patient whether or not they had insurance.  Lastly, he opined that "any differences in her physical exam from visit to visit reflect the variance in her pain level at each particular visit."

Testimony Before the ALJ

July 7, 2008 administrative hearing

At the July 7, 2008 administrative hearing, Shelly testified that she lived with her fiancé and his two sons, ages thirteen and twelve.  She stated she had attained a high school diploma, received additional vocational training, and previously served as a supervisor.

Shelly testified that her pain was constant and so painful that she could not walk at times.  She takes pain medication, for which her fiancé pays.  She stated she could cook quick meals, though her sons and fiancé washed the dishes and did

the laundry, as the inability to bend over precluded her from doing laundry.  She could usually bathe and groom herself, though she sometimes needed assistance from her fiancé.   Additionally, her fiancé vaccuumed.  She discontinued her previous hobbies and did not attend church or shop.  She mainly spent her days in a lying position.  She stated she could only walk for half a block, could only sit for half an hour, could only lift a gallon of milk, and could only stand ten to fifteen minutes.  She claimed to walk with a limp due to an inability to put weight on her right heel and stated her pain was currently at a level of seven.

*October 25, 2010 administrative hearing*

Following remand, Shelly again testified that she lived with her fiancé and his two sons.  Additionally, her sister and her sister's young child had moved into the home.

Regarding a possible mental impairment, Shelly stated she had not seen a psychiatrist or psychologist, had never been hospitalized for a mental impairment, and was not currently receiving medication for a mental impairment.  Regarding her back injury, she stated she had never had back surgery.  She took strong medications for her back and had recently been switched from Vicodin to Methadone as a result of concern for the effects of continued use of Vicodin on her liver.  However, she continued to receive Vicodin for dealing with

breakthrough pain.

In describing her daily activities, Shelly stated she spent most of her days lying around.  She only walked inside the house and did not drive.  She walked with a limp due to the inability to put pressure on her right leg, and pain shot down her right leg when she walked  She stated her condition had deteriorated since 2008.  She was unable to do any house cleaning or laundry, as her sister and fiancé's sons did all household chores.  She used a claw-like device to assist her with picking things off the floor.  She testified she could only sit for half an hour before needing to lie supine on a couch.  Recently, her legs had gone completely numb, and she fell while getting out of a car.

When discussing a visit to Dr. Smith's office on October 11, 2010, Shelly's attorney stated that sometimes Shelly did not see Dr. Smith but instead just received a medication refill.  However, when questioned by the ALJ, Shelly stated she did in fact see Dr. Smith on October 11, 2010.  Yet she also stated a nurse took her vital signs; Dr. Smith only talked with her and did not perform a physical examination.  Her attorney further stated that Dr. Smith's notations this day regarding a normal gait were incorrect.  Shelly further stated that she "did not walk for him that day."

The ALJ found that this called into question the veracity of Dr. Smith's

medical records.  Consequently, the ALJ suspended the hearing in order to determine the procedural nature of Dr. Smith's examinations.

*November 30, 2010 supplemental hearing*

On November 30, 2010, Shelly's attorney requested a continuance at the beginning of the hearing.  The request was denied.  Shelly then left the room so her sister could testify, and Shelly's attorney requested that the ALJ observe Shelly's gait.

Testimony of Angela L. Duncan

Angela L. Duncan, Shelly's sister, stated she lived in Shelly's home along with Shelly's fiancé and his two sons.  She worked as a certified nursing assistant.  When not working, she stated she cleaned the house, did laundry, and prepared a dinner that could be easily placed in the oven.  She stated Shelly could no longer perform these activities, as Shelly was in constant pain that made moving difficult.  She stated Shelly was a very active person prior to her injury, and Shelly's personality had changed.  Duncan also testified that Shelly walked with a limp and that just walking from the car to the hearing caused her pain.  She stated Shelly could not work in her opinion since she cannot stand or sit for prolonged periods of time.

Testimony of Shelly

During the supplemental hearing, Shelly stated she had limped since at least May of 2005.  She stated she could not put pressure on her right heel "because it sends an electric shock."  She again stated that Dr. Smith had not performed a physical examination on October 11, 2010, but he had since performed a full examination on November 1, 2010.

Shelly also stated that her symptoms had increased in recent years.  As a result, she was no longer able to do any daily activities.  She could not do the laundry or dishes.  Additionally, a walk-in shower had been installed with a seat in it to assist her in bathing.  Despite this, she stated she still had problems bathing, and her sister assisted her.  She also stated she does not shop and was no longer involved in the school activities of her fiancé's children.  She stated that she had previously taken Zoloft for depression and continued to have problems with depression on a daily basis.  However, she no longer had a primary care doctor and could not afford one.  Lastly, she stated that by the end of the hearing her right side and spine began hurting badly, and she began shaking.

*Vocational Expert's Testimony*

Delores E. Gonzalez, Vocational Expert, responded to written interrogatories regarding Shelly's work capabilities.  The ALJ provided Gonzalez with a set of three hypotheticals.  Gonzalez testified that based on a hypothetical

individual of Shelly's age, education, work experience, and RFC, Shelly could

perform past relevant work as a hotel housekeeper.  Gonzalez based this

determination on the ALJ's RFC assessment finding Shelly could occasionally lift

twenty pounds and frequently lift ten pounds and could stand or walk for six hours

out of eight while sitting two hours out of eight.

*Fiance's Statement*

On January 7, 2011, Shelly's fiancé, Jay Duncan, provided a verified

statement.  He stated that in July, Shelly's legs had given out while she was

exiting a car.  Shelly could not walk, so Duncan carried her into his mother's

home.  He stated Shelly experiences problems placing weight on her right leg, and

her body occasionally shakes up and down.  This causes her to cry in physical

pain.

Duncan further stated that he installed the walk-in shower and seat due to

Shelly's inability to step into the bathtub.  At times she still required his assistance

with bathing.  He stated that Shelly's sister did the cooking, cleaning, vacuuming

and other household activities.  He stated that he or his son prepared evening

meals, and he and the boys had a list of chores.  They took turns doing laundry and

washing dishes.  Duncan stated that Shelly could not do the laundry due to the

bending required.  Also, Shelly's sister walked to the mailbox each day to retrieve

mail.

Duncan stated that he paid for Shelly's visits to the doctor.  He also opined that Shelly could not sit at a job for six hours a day, as she could not physically sit for this length of time.  Additionally, she could not walk for two hours a day.

### Legal Standard

A court determines on review whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009).  Substantial evidence is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion.  *Id.*  When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion.  *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).  This standard of review requires consideration of evidence supporting the Commissioner's decision as well as evidence detracting from it.  *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009).  However, if the evidence allows for two inconsistent positions, and one of these positions represents the ALJ's findings, the court must affirm the ALJ's decision.  *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011).

To determine whether substantial evidence supports the decision, the Court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;
(2) the education, background, work history, and age of the claimant;
(3) the medical evidence from treating and consulting physicians;
(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;
(5) any corroboration by third parties of the plaintiff's impairments; and
(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health and Human Serv.*, 957 F.2d 581, 585-86 (8th Cir. 1992).

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure.

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, she is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not disabled.

- 24 -

Third, if the claimant has a severe impairment, the Commissioner evaluates

whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the

Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner

cannot make a decision based on the claimant's current work activity or on

medical facts alone, the Commissioner determines whether the claimant can

perform past relevant work.  If the claimant can perform past relevant work, she is

not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner

must evaluate whether she can perform other work in the national economy.  If

not, the claimant is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is

never free to ignore the subjective testimony of the claimant, even if it is

uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d

1166, 1169 (8th Cir. 1984).  However, the ALJ may disbelieve a claimant's

subjective complaints when they are inconsistent with the record as a whole.  *See,

e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).  When considering

subjective complaints, the ALJ must consider the factors set out in *Polaski v.*

- 25 -

*Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), which include a claimant's prior

work record and observations by third parties and treating and examining

physicians relating to:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; (5) functional restrictions.

*Id.*; *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011).

<u>The ALJ's Findings</u>

Based on all the evidence following the second administrative hearing, the

ALJ found Shelly was not disabled from March 14, 2004 through the date of the

decision.  Specifically, the ALJ made the following determinations:

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2009.

2.  The claimant had not engaged in substantial gainful activity since March 14, 2004, the alleged onset date.

3.  The claimant had the severe impairments of degenerative disc disease and degenerative joint disease (osteoarthritis) of the lumbar spine, and depression or post-traumatic stress disorder.

4.  The claimant did not have an impairment that met or medically equaled a listed impairment in Appendix 1.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

5.  Based on a careful consideration of the entire record, the claimant had a residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 516.967(b).  Specifically, the claimant retained the capacity to understand, remember, and carry out

simple instructions and non-detailed tasks; adapt to simple routine work changes, take appropriate cautions to avoid hazards; perform repetitive work according to set procedures, sequence, or pace; and maintain regular attendance without special supervision.  Also, the claimant had no other nonexertional limitations.

6.      The claimant was capable of performing past relevant work as a hotel housekeeper.  This work did not require the performance of work-related activities precluded by the claimant's RFC.  20 C.F.R. § 404.1565; § 416.965.

7.      The claimant has not been under a disability, as defined by the Social Security Act, from March 14, 2004 through the date the decision.

The ALJ noted that Shelly did not meet Listing 1.04 for a spinal disorder because she lacked evidence of such things as nerve root compression or an inability to ambulate effectively.  The ALJ also found that Shelly's mental conditions did not impair her daily activities.  The ALJ found Shelly had only mild difficulties with social functioning, as she spends most of the day home alone and is the only person to care for an infant living in the home.  The ALJ also noted only moderate difficulties in concentration, persistence or pace.  The ALJ found that Shelly is able to perform household chores, and when she is unable to do so, she "supervises two teenage boys in the execution of all household tasks and other necessary chores."  The ALJ also noted that, while Shelly's primary care provider diagnosed mental disorders, no clear diagnosis exists and Shelly has not received treatment or medication for nearly five years.

- 27 -

After much discussion of medical records and testimony from the administrative hearing, the ALJ also determined that Shelly's medically determinable impairments could reasonably be expected to cause some symptoms. However, her statements regarding the intensity, persistence, and limiting effects were not credible.  The ALJ based this on Shelly's "spotty work record," her testimony that "a number of her doctors" falsified information, her testimony that emergency room records had disappeared, her gaps in treatment records, the inconsistent nature of her limp, and the noted pain alleviation derived from medication.  Also, the ALJ discredited the testimony of Shelly's sister and fiancé since both would benefit greatly from benefits, and dismissed the physicians' disability determinations since disability is an "issue for the Commissioner of Social Security."  Lastly, the ALJ found that Shelly could not be disabled since surgery would correct her problems.

## Discussion

Shelly argues on appeal that the ALJ's credibility determination was not supported by the evidence and that the ALJ wrongly dismissed medical opinion evidence.  Each will be discussed below.

I.      The ALJ's Credibility Determination

Since evidence of pain is subjective in nature, an ALJ "cannot simply reject

complaints of pain because they were not supported by objective medical evidence." *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). Instead, the ALJ is required to consider all evidence relating to the complaints. *Id.* Under the framework set forth in *Polaski*, an ALJ must consider the following factors when evaluating a claimant's credibility:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Buckner*, 646 F.3d at 558. An ALJ is not required to explicitly discuss each *Polaski* factor. *Id.* Further, an ALJ cannot discount a claimant's allegations of pain based solely on a lack of objective medical evidence to support them, but may find a lack of credibility based on inconsistencies in the evidence as a whole. *Id.* The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore*, 572 F.3d at 525 (quoting *Holmostrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001)). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner*, 646 F.3d at 558.

The inconsistencies relied upon by the ALJ to discredit Shelly include: 1) gaps in treatment; 2) a "spotty work record"; 3) lack of objective medical

evidence; and 4) allegations by Shelly that doctors falsified medical records.

Examining each of the alleged inconsistencies reveals a lack of substantial support

for the ALJ's credibility determination.

*Gaps in Treatment*

In finding Shelly less than credible, the ALJ pointed to gaps in treatment

that would be inconsistent with debilitating pain.  It is true that significant gaps in

treatment can undermine a claimant's credibility.  *Mouser v. Astrue*, 545 F.3d 634,

638 (8th Cir. 2008).  However, the record here establishes no significant gaps.

Throughout 2004, Shelly regularly visited multiple treating doctors.  In 2005,

Shelly did fail to physically visit Dr. Smith since she lost her medical insurance,

but records indicate that, as directed by Dr. Smith, she called his office on a

regular schedule to obtain medication refills.  In addition to obtaining medication

as directed, Shelly also visited the emergency room due to back pain in November

of 2005 and visited Dr. Smith due to new radicular symptoms in 2006.

The ALJ stated that Shelly "went for years without being seen by Dr. Smith

until she reportedly fell on her porch in April 2008."  Yet the record provides no

support for this statement.  Not only did Shelly visit Dr. Smith in 2006, but she

visited him *five times* in 2007.  She also visited his office in early 2008 and

routinely called his office to discuss cheaper medications and to obtain refills as

directed.

Shelly's physical visits to Dr. Smith were not as frequent in 2008 and early 2009, yet she obtained medication as directed, visited Dr. Smith multiple times when a change in symptoms occurred, and consulted with other physicians about possible surgeries.  In late 2009 and throughout 2010, she again began seeing Dr. Smith on a regular basis.  In sum, there are simply no significant breaks in treatment to support the ALJ's statements.

*Spotty Work Record*

The ALJ also pointed to Shelly's "spotty work record" as evidence of a lack of credibility.  As stated in *Polaski*, consideration of a claimant's work record can be part of a credibility determination.  739 F.2d at 1322.  However, the record does not demonstrate a "spotty work record."  While Shelly was not a high wage earner, she consistently maintained employment during the five years prior to her alleged onset of disability on March 14, 2004.  In fact, she held the same job as a hotel front desk clerk for three years prior to her alleged onset date.  *See Allen v. Califano*, 613 F.2d 139, 147 (6th Cir. 1980) (finding continuous annual earnings between $5000 and $6000 to support a claimant's credibility); *see also Higgins v. Apfel*, 136 F. Supp. 2d 971, 980 (E.D. Mo. 2001) (saying that since claimant's "earnings history shows regular employment which abruptly ceased, her

- 31 -

employment history does not constitute substantial evidence that she was not disabled"). Consequently, there is nothing to indicate Shelly had a lack of willingness to work, and the record fails to support the ALJ's statement that Shelly had a spotty work record.

*Objective Medical Evidence*

The lack of an objective medical basis to support a claimant's subjective complaints can be considered in evaluating a claimant's credibility. *Polaski*, 739 F.2d at 1322; *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002). Here the ALJ found a lack of objective medical evidence to support Shelly's claims since several medical records indicated full strength and a normal gait. However, the record as a whole does not support the ALJ's determination.

Although the preliminary examination sections of many medical visits note full strength and a normal gait, others indicate limited lower extremity strength and an abnormal gait. In fact, four different doctors noted Shelly had a guarded or antalgic gait. Dr. Neighmond first noted an antalgic gait in September of 2003, and Dr. Smith noted a guarded gait with a right sided limp as late as November of 2010. Additionally, almost every doctor's visit noted limited range of motion in the lumbar spine and pain with flexion and extension of the lumbar spine. Moreover, numerous examinations revealed a positive right straight leg raise.

- 32 -

Radiological exams provide further objective medical support for Shelly's complaints.  An MRI in 2004 revealed degenerative disc disease at L5-S1 and intervertebral disc space narrowing.  In September of 2004, a positive discogram indicated discogenic pain.[1]  An MRI on June 20, 2008 indicated a worsening of Shelly's spinal condition, as it revealed facet osteoarthritic changes, diffuse degenerative disc disease, and central disc bulging.  Lastly, a November, 2008 X-Ray revealed disc narrowing and a severely collapsed disc.  Based on these radiological exams, all doctors found Shelly had a documented source for her pain.  As Dr. Feinberg stated, Shelly's pain is "explicitly verified by diagnostic studies."

Following the ALJ's medical conclusion in the 2008 decision that a lack of atrophy was inconsistent with Shelly's complaints, both Dr. Feinberg and Dr. Raskas explained that atrophy is not consistent with the discogenic pain process.  A similar medical explanation might exist for the visits indicating full lower extremity motor strength, as it might be possible that the discogenic pain process does not limit lower extremity strength.  The ALJ simply relied too heavily on a single type of testing to suggest a lack of objective medical evidence, especially in the face of significant and contrary objective medical evidence.  Consequently, the

---

[1] A discogram is the record produced by discography, a "radiographic demonstration of intervertebral disk by injection of contrast media into the nucleus pulposus." PDR Medical Dictionary 550 (3d ed. 2006).  Discogenic denotes a "disorder originating in or from an intervertebral disc." *Id.*

ALJ's reasoning lacks substantial support.

*Possible Falsified Medical Records*

The ALJ also found reason to question Shelly's credibility based on Shelly's statements about her doctors. Specifically, the ALJ stated that Shelly accused many doctors of "a myriad of errors, omissions, or falsehoods" and that "emergency room records have completely disappeared." Also, the ALJ stated that Shelly alleged that "the medical records all falsely report her pain..." Yet a review of the record reveals that the ALJ magnifies and miscasts Shelly's statements.

When discussing an October, 2010 visit to Dr. Smith during the administrative hearing, Shelly stated that Dr. Smith only talked with her and did not perform a full examination. Her attorney further stated that Dr. Smith's notations regarding a normal gait were incorrect. Shelly also stated that she "did not walk for him that day." The ALJ contacted Dr. Smith, and he responded by saying that he or a nurse practitioner performed the documented tests. He stated the October, 2010 visit was no different and that any differences "from visit to visit reflect the variance in her pain level at each particular visit."

The lack of symmetry between the statements of Shelly and Dr. Smith regarding the examinations performed by Dr. Smith are a proper basis for

evaluating credibility.  *See Karlix v. Barnhart*, 457 F.3d 742, 748 (8th Cir. 2006)

(finding a lack of credibility when claimant's testimony regarding drinking

consumption conflicted with medical documentation).  While this does cause

concern, the ALJ magnified Shelly's statements.  Nothing in the record supports

the ALJ's statement that Shelly alleged "a myriad of errors, omissions, or

falsehoods" and that "emergency room records have completely disappeared."

Likewise, Shelly never alleged that "the medical records all falsely report her

pain."  While it is proper to give some weight to Shelly's allegations regarding Dr.

Smith's practices, the ALJ magnified the allegations to the point of contriving

statements that did not exists.  The possible inconsistency provided some support

for the ALJ's position, but this alone did not constitute substantial support on the

record as a whole, especially when one evaluates other factors within the entirety

of the evidence.

*Other Factors*

A review of the entire record reveals little support for the ALJ's credibility

determination.  Moreover, the standard of review required of this court, that the

ALJ's decision be based on substantial evidence, necessitates consideration of

evidence both supporting the Commissioner's decision as well as evidence

detracting from it.  *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009).

Looking at other factors not addressed above enhances the credibility of Shelly.  One factor to be considered under *Polaski* involves the claimant's daily activities.  739 F.2d at 1322.  Here, Shelly consistently stated she did very few activities.  During the 2008 hearing, Shelly stated she spent most of her day in a lying position, and she could cook quick meals.  She also stated her fiancé and his sons do the laundry, dishes, vacuuming, and feeding of pets.  She could bathe and groom herself most of the time, though sometimes she required the assistance of her fiancé.  She did not attend the children's school activites, did no shopping, had no hobbies, did no driving, and could only lift a gallon of milk.

Shelly's testimony during the 2010 hearing is almost identical, as she again stated she could do very few daily activities.  She further stated that her deteriorating condition now caused her to use a claw-like device to pick up things.  Moreover, her fiancé installed a walk-in shower with a seat in it to allow her to bathe, yet she still requires his assistance.  Third party statements corroborate this testimony.  Her sister, a certified nursing assistant living in the same home, stated Shelly was a very active person prior to the injury, but Shelly could no longer perform normal daily activities.  Her sister cleaned the house, did laundry, and sometimes prepared dinners.  Similarly, Shelly's fiancé testified that, despite the installation of a walk-in shower and seat, Shelly still required assistance with

bathing.  He stated Shelly's sister did most household activities and others were performed by himself and his sons.  While the ALJ may discount third party testimony from relatives when they have a financial interest in the matter, *see Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993), the statements should still be considered and given some weight.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Polaski*, 739 F.2d at 1322.  Consequently, even when discounted the third party statements support Shelly's statements regarding her daily activities.

An examination of the dosage, effectiveness and side effects of medication also supports Shelly's credibility.  Although the ALJ correctly noted that Shelly occasionally reported improvements of fifty to sixty-five percent, other exams noted that medication provided only a thirty percent relief from pain.  Importantly, this partial relief was only obtained through the use of very heavy medications. *See Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002) (holding that the ALJ's finding of only mild to moderate pain was not supported when strong medications such as Oxycontin and Vicodin were prescribed).  Early medications prescribed to Shelly included Celebrex and Vicodin, a hydrocodone used to treat moderate to severe pain.  *Physician's Desk Reference (PDR)* 573 (65th ed. 2011). Shelly's consistent use of hydrocodone and other pain relievers continued for several years.  In 2010, Dr. Smith began prescribing methadone, a drug "similar in

action to morphine but with *slightly greater potency* and longer duration."

*Stedman's Medical Dictionary* 1103 (27th ed. 2000) (emphasis added).  He soon

increased Shelly's dosage of methadone and continued to prescribe hydrocodone.

In short, Shelly obtained only partial relief from very strong medications.  Such

partial relief for chronic pain does not indicate Shelly could return to her previous

job, especially when she often experienced breakthrough pain.  *See Bowman*, 310

F.3d at 1083 (holding that occasional relief of chronic pain did not mean that pain

was sufficiently controlled to allow a return to work).

## II.    Weight Given to Treating Physician's Opinion

        Shelly also argues the ALJ erred by rejecting medical opinion evidence

from both treating and consultative physicians.  Generally, the opinion of a

treating physician is given controlling weight when it is well-supported by

medically acceptable clinical and diagnostic techniques and is not inconsistent

with other sustainable evidence on the record.  20 C.F.R. §§ 404.1527(d)(2),

516.927(d)(2); *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009).  A treating

physician's opinion is given deference over opinions from consultative physicians.

*Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992).  Opinions from non-

treating sources are evaluated using factors set forth in 20 C.F.R. §§ 404.1527(d)

and 416.927(d).

The ALJ acknowledged that many doctors provided statements reporting the claimant was disabled. However, the ALJ stated "[t]hese are given no weight as disability is an ultimate issue for the Commissioner of Social Security...." It is true that a statement from a physician that a claimant is disabled is not a medical opinion, as such a finding is ultimately reserved to the commissioner. 20 C.F.R. § 404.1527(d). Such a statement is not binding, as all medical findings and other evidence supporting such a statement must be weighed. *Id.*

To say that a physician's statement that a claimant was disabled "are given no weight" misstates the law. SSR 96-5p interprets this portion of the regulations. Such policy interpretations are intended to be binding on the Social Security Administration and must be given deference by the courts. *Newton v. Chater*, 92 F.3d 688, 693 (8th Cir. 1996). The interpretation states that "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner." SSR 96-5p. While treating source opinions on such issues as disability "are never entitled to controlling weight," they "must never be ignored."

This interpretation is consistent with case law. The Eighth Circuit has stated that a physician's opinion on disability should not be treated with deference. *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007). However, error occurs when

an ALJ fails to consider a treating physician's opinion that a claimant is disabled and provides no reason for rejecting it. *Prince v. Bowen*, 894 F.2d 283, 285-86 (8th Cir. 1990); *see also Tilley v. Astrue*, 580 F.3d 675, 679-680 (8th Cir. 2009) (holding the ALJ erred by not giving appropriate weight to a treating physician's statement that a claimant could not perform light work since the statement was consistent with the overall medical evidence). Here, the ALJ summarily stated that the many doctors' statements regarding Shelly's disability "are given no weight" without giving any reason for rejecting it. Consequently, the ALJ erred by failing to consider these opinions without providing a proper reason as required by both SSR 96-5p and case law.

III.     Unresolved Issues Regarding Surgery

The ALJ lacked substantial evidence to support his credibility determination and accorded improper weight to a treating physician's opinion. This court may affirm, modify, or reverse the Commissioner's decision with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). Ordinarily, when a denial of benefits is found to be improper, the case is remanded to the ALJ out of deference. *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). Reversal and an immediate award of benefits is appropriate only where the record overwhelmingly supports a finding of disability. *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir.

2009).

The record here demonstrates marked limitations in Shelly's ability to function.  Shelly testified she is able to perform almost no daily activities, and she can only sit for half an hour.  Third party statements supported her testimony.  All doctors, including her treating doctors, found an objective basis for her pain.  All doctors, including her treating doctors, found her to be incapable of working in her present state.  A previously active and productive woman now spends her days lying on a couch in pain.  Given that this case has already been remanded once and the ALJ again made a myriad of errors in her second decision, this would seem to be a good case for reversal and an award of benefits.  However, there are still unresolved issues pertaining to a possible surgical intervention.

Although I find Shelly to be disabled in her present state, her condition might be resolved by surgery.  The ALJ and the defendant's brief state that an impairment cannot be considered disabling if it can be controlled through treatment, which is consistent with case law.  *See Medhaug v. Astrue*, 578 F.3d 805, 814 (8th Cir. 2009).  However, this case differs from *Medhaug* and the usual cases where a claimant can control a condition through medication, or where a claimant fails to take medication as directed.  *See id.*(finding a claimant who was not a surgical candidate and was currently employed as a bus driver could control

his pain with medication and steroid injections); *see also Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993) (finding a claimant's headaches could be controlled by medication). Instead, Shelly has consistently taken very strong medications and has repeatedly tried various steroid injections, yet this has failed to alleviate her pain in a manner that would allow her to function. She has been deemed a candidate for surgery–and she wishes to pursue surgery–yet she cannot afford it.

It has been said that "medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered." *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). Moreover, "a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be...an independent basis for finding justifiable cause for noncompliance." *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984). Consequently, it must be determined whether Shelly's failure to obtain surgery is excused.

SSR 82-59 interprets the regulations pertaining to a failure to follow prescribed treatment. As stated above, such policy interpretations are intended to be binding on the Social Security Administration and must be given deference by the courts. *Newton v. Chater*, 92 F.3d 688, 693 (8th Cir. 1996). For SSR 82-59 to apply, the claimant must first be found disabled without the prescribed treatment. *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001). Here, it has been

determined that the ALJ made a myriad of errors in denying disability based on a lack of credibility and on gaps in treatment. Moreover, this court has determined that the entire record supports a finding that Shelly is disabled without surgery. Consequently, SSR 82-59 applies.

The interpretation directs the Social Security Administration to first identify "failure" as an issue. SSR 82-59. Notably, failure to follow a prescribed treatment can only be found if the treatment "is *clearly expected* to restore capacity to engage in any SGA." *Id.* (emphasis added). Here, the record is not conclusive as to whether or not surgery can clearly be expected to alleviate Shelly's disability. The ALJ stated multiple times that Shelly's pain can be resolved with surgery, but in making this statement the ALJ commits a logical fallacy. Dr. Smith repeatedly stated Shelly would be unable to return to work without some definitive treatment such as surgery. Other doctors made nearly identical statements. These statements cannot be illogically twisted to signify that Shelly would definitely be able to return to work with surgery. They merely state she cannot work without surgery; the opposite may or may not be true. Moreover, Dr. Raskas, the surgeon who wished to operate on Shelly, stated only that Shelly was "in need of the above surgery" and "has been disabled for the last four and a half years." He did not predict any level of success from the surgery indicating she would clearly be expected to return to

- 43 -

work.  *C.f. Mellon v. Heckler*, 739 F.2d 1382, 1383 (8th Cir. 1984) (finding that a doctor's statement that a stay at a residential treatment center "might offer a chance of success" of improving claimant's mental health condition did not suggest that claimant's psychological impairment was remediable).

Ultimately the decision as to whether or not spinal fusion or a diskectomy will enable Shelly to return to work is an issue to be decided by the SSA.  SSR 82-59.  However, the record does not currently contain enough information for the SSA to make this determination.  A procedure as intrusive as back surgery may or may not have a high success rate.  *See*, *e.g.*,  *Teter v. Heckler*, F.2d 1104, 1107 (10th Cir. 1985) (finding that evidence suggested the claimant might remain thirty to forty percent disabled after back surgery); *Jones v. Heckler*, 702 F.2d 950, 953 (11th Cir. 1983) (finding the record insufficient to determine whether a myelogram or disc surgery would return a claimant to work); *Eakin v. Astrue*, 432 Fed. Appx. 607, 613 (7th Cir. 2011) (finding "no medical opinion on record suggesting that a hip replacement would be 'clearly expected' to restore" claimant's capacity to work).  This is especially true in light of Dr. Feinberg's repeated statements that a delay in surgery might cause a permanent neurologic defect.  Consequently, the SSA on remand must more fully develop the record to determine whether the back surgery is clearly expected to enable Shelly to return to work.

If the SSA on remand determines that back surgery is not clearly expected to restore Shelly's capability to work, then Shelly is disabled.  On the other hand, if the SSA more fully develops the record and determines that back surgery is clearly expected to restore Shelly's capacity to work, the SSA must then determine whether a justifiable cause exists for why Shelly has not undergone the surgery. SSR 82-59.  If a claimant is "unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable," then a justifiable cause exists for not having the procedure.  *Id.*; *see also Tome*, 724 F.2d at 714.  The claimant must show that she has searched for free or subsidized treatment and must document her financial circumstances.  SSR 82-59; *see also Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003); *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992); *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984).  Before the claimant is denied based on a lack of a justifiable cause, the claimant should be made aware of the effect of not undergoing the procedure and should be given an opportunity to undergo the procedure.  SSR 82-59; *Gordon*, 725 F.2d at 237.

The ALJ states that Shelly never pursued treatment at "the many clinics and hospitals available to the medically uninsured or underinsured in the St. Louis area."  However, there is no basis on the record to determine that a clinic or

- 45 -

hospital in the local community will perform a back surgery for free or at a

subsidized rate.  The only evidence on the record is to the contrary, as Dr. Smith

stated that he doubted Shelly could find someone to operate for free.  Indeed,

finding a surgeon willing to perform back surgery for free will most likely differ

from obtaining medication or even mental health counseling for free.  *See Osborne*,

316 F.3d at 812 (denying a claim in part because claimant failed to demonstrate

that they attempted to obtain mental health treatment for free).  After all, the cost of

surgery might be significant.  *See Teter*, 775 F.2d at 1107 (finding that a claimant

could not afford a back surgery since it costs $8000 to $10,000).  This would

explain Dr. Smith's repeated statements–in addition to the above statement–saying

that Shelly could not afford the needed procedures without insurance.

 To summarize, the SSA on remand must first more fully develop the record

to determine whether the surgery would be "clearly expected" to return Shelly's

work capabilities.  This might involve contacting treating doctors such as Dr. Smith

and the physician wishing to perform surgery, Dr. Raskas, and other treating and

evaluating physicians to determine the likely outcome of a surgery.  Only if the

surgery meets the "clearly expected" requirements should the SSA proceed to the

next step of assessing whether free or low-cost treatment is available.  Again, the

record contains evidence showing that back surgery is most likely not available for

free or low cost, but the record should be supplemented to ensure that low cost

back surgery is not available.  Additionally, Shelly should provide evidence of her

financial status.  If Shelly cannot afford surgery and no low cost surgery is

available, then Shelly is disabled even if the surgery meets the clearly effective

criteria.

Importantly, in the unlikely event that low cost back surgery is available,

then Shelly must be informed of the effect of this on her eligibility for benefits.

SSR 82-59; *Gordon*, 725 F.2d at 237.  She must then be "afforded an opportunity

to undergo the prescribed treatment" before SSA determines that she failed to

receive the treatment.  SSR 82-59; *Gordon*, 725 F.2d at 237.

It is also important to note that SSR 82-59 states that when "the issue of

'failure' arises at the hearing or AC levels, if not fully developed through testimony

and/or evidence submitted, and it has been 12 months after onset, a favorable

decision will be issued, and the case will be referred for development of failure to

follow prescribed treatment."  This is the case here, and the SSA should comply

with these guidelines.  Moreover, this issue "should be resolved as quickly as

possible," SSR 82-59, especially since more than six years have passed since

Shelly initially filed her application for benefits, and Shelly's doctors have stated

that the risk of permanent neurologic defects increases with delays.

- 47 -

The ALJ's determination that Shelly suffered no disability after March 14, 2004 is not supported by substantial evidence in the record as a whole.  Instead, the record contains ample evidence that Shelly is disabled in her current state, and the record regarding a possible surgery needs to be more fully development.  The decision should therefore be reversed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and remanded to the Secretary for further proceedings in accordance with this opinion.  A separate judgment in accordance with this Memorandum and Order is entered this same date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 24th day of April, 2012.